IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CALBEX MINERAL LIMITED,** ) | |
| ) | **Civil Action No. 13-276** |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| **ACC RESOURCES CO., L.P.,** ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## <u>OPINION</u>

**CONTI, Chief District Judge**

### I.    <u>Introduction</u>

Pending before the court is a motion for summary judgment (ECF No. 31) filed by plaintiff Calbex Mineral Limited ("Calbex") to enforce an arbitral award against defendant ACC Resources Co., L.P. ("ACC"). The arbitral award was issued on November 19, 2012, by the China International Economic & Trade Arbitration Commission ("CIETAC"). After consideration of the parties' submissions and the applicable legal principles, the court concludes that in light of the summary judgment standard of review, FED. R. CIV. P. 56, and based upon the evidence of record, Calbex adduced evidence sufficient to show the arbitral award should be enforced, and ACC failed to adduce evidence sufficient to establish a genuine dispute of material fact with respect to whether any of the enumerated defenses provided for in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), *adopted* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, 9 U.S.C. § 201, et seq. (enforcing the New York Convention), applies in this case. Accordingly, Calbex's motion for summary

judgment will be granted, the arbitral award will be enforced, and Calbex will be entitled to post-award, prejudgment interest, but not attorneys' fees, for the reasons set forth herein.

## II.  Background

### A. Procedural Background

On February 22, 2013, Calbex, which is incorporated under the laws of the British Virgin Islands and has its central office in China, commenced this action by filing a complaint against ACC to enforce the arbitral award issued by CIETAC on November 19, 2012. (ECF No. 1; ECF No. 42 ¶ 1.) On March 27, 2013, ACC, a limited partnership organized under the laws of New Jersey with its principal office in New Jersey, filed an answer in which it denied that the award is enforceable by this court.[1] (ECF No. 6; ECF No. 42 ¶ 2.)

On April 17, 2014, the court issued an order setting the schedule for the filing of a summary judgment motion. (ECF No. 30.)  On May 16, 2014, pursuant to the court's order, Calbex filed a motion for summary judgment, (ECF No. 31), a brief in support of its motion, (ECF No. 32), and a concise statement of material facts. (ECF No. 33.)  On June 16, 2014, ACC filed its brief in opposition to Calbex's motion for summary judgment, (ECF No. 35 redocketed to ECF No. 38), a responsive concise statement of facts, (ECF No. 36), and an appendix in support of its opposition brief. (ECF No. 37.)

On June 30, 2014, Calbex filed a reply brief in support of its motion for summary judgment and a reply to ACC's statement of facts. (ECF Nos. 39, 40.)  On July 7, 2014, ACC

---

[1]        This court has general jurisdiction over ACC and subject-matter jurisdiction over the case because at least one of Calbex's claims falls under the New York Convention and is deemed to arise under the laws of the United States. <u>See</u> 9 U.S.C. § 203 ("An action or proceeding falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.").

filed a motion for leave to file a sur-reply in opposition to plaintiff's motion for summary judgment. (ECF No. 41.)  On July 8, 2014, the parties filed a combined concise statement of material facts. (ECF No. 42.)  On July 9, 2014, the court granted ACC's motion for leave to file a sur-reply and the sur-reply was filed on July 10, 2014. (ECF Nos. 43, 44.)  Calbex's motion for summary judgment having been fully briefed is now ripe for disposition.

## B.  Factual Background[2]

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### 1.  CIETAC's and the Shanghai Sub-commission's Background

CIETAC is a permanent international arbitration commission created to independently resolve economic and trade disputes.  (ECF No. 42-1 at 131.) "It was set up by the China Council for the Promotion of International Trade (China Chamber of International Commerce) under the authority of the relevant State Order and in accordance with the law." (Id.)  CIETAC is based in Beijing and, pursuant to regulation, has the right to establish and maintain sub-commissions. (Id.) CIETAC has established sub-commissions in Shenzhen, Shanghai, Tianjin and Chongqing. (Id. at 140.)  The sub-commissions are CIETAC branches which are required to accept and arbitrate cases pursuant to CIETAC's arbitration rules. (Id.) Parties submitting disputes to CIETAC have the right to submit their case directly to a CIETAC sub-commission. (Id.)

### 2.  The Shanghai Sub-Commission Declaration of Independence and its Termination From CIETAC

---

[2]     Facts relevant to specific issues will be addressed in the discussion about those issues.

Sometime before May 1, 2012, the Shanghai sub-commission declared independence from CIETAC. (ECF No. 42-1 at 131.) On May 1, 2012, CIETAC released a statement that provided:

> Recently, without any approval the CIETAC Shanghai Sub-Commission which is a branch office of CIETAC, declared that it [was] an independent arbitral institution, constituted its own commission, published its own arbitration rules and adopted its own panel of arbitrators. Such conducts have violated the Arbitration Law of China and the relevant regulations of the State Council as well as CIETAC's Articles of Association, causing confusion in the domestic and international arbitration communities and seriously affecting parties' exercise of their arbitration rights.

(Id.) The statement provided that the Shanghai sub-commission's act of declaring independence from CIETAC was "null and void." (Id.)

On August 1, 2012, CIETAC released an announcement that provided in pertinent part:

> 1.      As from 1 August 2012, CIETAC's authorization to the CIETAC Shanghai Sub-Commission and the CIETAC South China Sub-Commission for accepting and administering arbitration cases is hereby suspended.
>
> 2.      As from 1 August 2012, where parties have agreed to arbitrate their disputes by the CIETAC Shanghai Sub-Commission or the CIETAC South China Sub-Commission [], the parties shall submit their applications for arbitration to CIETAC and the CIETAC Secretariat shall accept such arbitration applications and administer such cases. Without CIETAC's authorization, no institutions shall have the right to accept and administer the afore-mentioned arbitration cases.

(Id. at 134.) On December 31, 2012, the interaction between the CIETAC and its Shanghai sub-commission culminated with the following announcement from CIETAC:

> The CIETAC Shanghai Sub-Commission and the CIETAC South China Sub-Commission have decided without authorization not to accept the lawfully revised CIETAC Arbitration Rules (2012), set up respectively their own arbitration rules and panels of arbitrators, refused to remain under the leadership of CIETAC in respect of case administration, and declared themselves independent arbitration commissions.
>
> In order to uphold the uniformity of the legal system of arbitration in China, safeguard parties' arbitration rights and ensure CIETAC's normal business

operations upon authorization and approval by the CCPIT (CCOIC) and in accordance with the Arbitration Law of China, the CIETAC Articles of Association and the CIETAC Arbitration Rules, CIETAC hereby announces the following decision on the issues concerning the CIETAC Shanghai Sub-Commission and the CIETC South China Sub-Commission:

…

2. Authorization to the CIETAC Shanghai Sub-Commission and the CIETAC South China Sub-Commission for accepting and administering arbitration cases is hereby terminated.

…

7. Cases accepted and administered by the CIETAC Shanghai Sub-Commission and the CIETAC South China Sub-Commission before 1 August 2012 may be concluded in accordance with the CIETAC Arbitration Rules and under the uniform leadership of CIETAC in respect of case administration as provided in the Rules.

(Id. at 137-38.)

### 3. The Disputes Between Calbex and ACC

This suit concerns two independent contracts: 1) the contract titled "2009ZC1216," which the parties entered into on December 16, 2009 (the "2009 contract") (ECF No. 42-1 at 80); and 2) the contract titled "2010ZC0211," which the parties entered into on February 11, 2010 (the "2010 contract") (ECF No. 42-1 at 53). Both contracts contained the following arbitration clause (the "arbitration clause"):

> **Arbitration.** All disputes arising between the parties in connection with Contract shall be submitted to China International Economic & Trade Arbitration Commission ("CIETAC") for settlement by Arbitration in accordance with the CIETAC's provisional rules of procedure. The award rendered by CIETAC shall be final and binding on both parties.

(ECF No. 42 ¶ 29; ECF No. 42-1 at 24).

### a. The 2009 Contract Dispute

In 2009, Calbex agreed to provide ACC 1,000 tons of brown fused alumina to be sold to third parties in Brazil. (ECF No. 42 ¶ 27.) ACC alleges that the vast majority of the product was rejected as defective by ACC's clients. (Id.; ECF No. 37-1 ¶ 3.) ACC sought reimbursement of

the purchase price from Calbex. (Id.) Calbex refused to return the purchase price or negotiate with ACC regarding the 2009 contract because it disputed the assertion that the product was defective. (ECF No. 42 ¶ 27.)

### b. The 2010 Contract Dispute

On February 11, 2010, Calbex and ACC entered into the 2010 contract. (Id. ¶¶ 7, 9.) Pursuant to the 2010 contract, ACC purchased 2,100 megatons of brown corundum from Calbex at a unit price of $570 per megaton for a total contract price of $1,197,000. (Id. ¶ 7.) On April 16, 2010, Calbex tendered the full amount of goods as required under the 2010 contract. (Id. ¶ 10.) ACC received the goods and did not object to the quality of the goods. (Id. ¶ 11.) ACC offered to pay only 70% of the 2010 contract purchase price and offered to pay the remaining 30% of the 2010 contract purchase price after the dispute over the 2009 contract was resolved. (Id. ¶ 12.) Calbex accepted the payment terms proposed by ACC to avoid greater loss. (Id. ¶ 13.)

ACC paid Calbex $838,900, representing 70% of the 2010 contract price. (Id. ¶ 28.) After receiving 70% of the 2010 contract price, Calbex sought to recover the outstanding balance, i.e., $359,100. (Id. ¶ 14.) On December 14, 2010, Calbex submitted a request to CIETAC for arbitration of its dispute with ACC regarding payment of the remaining 30% of the 2010 contract. (ECF No. 42 ¶ 15.) Calbex requested that CIETAC determine that ACC was obligated to pay the remaining 30% balance of the contract price. (Id. ¶ 16.)

The dispute over the 2010 contract was assigned to a panel and scheduled for a hearing in Beijing. (Id. ¶ 32.) The hearing on the 2010 contract was held on March 29, 2011. (Id.) At the hearing, neither party argued that the dispute over the 2009 contract had been resolved. (Id.) The Beijing panel concluded that the parties had indeed modified the payment terms of the 2010 contract and that the final 30% of the 2010 contract purchase price was not due until the dispute

over the 2009 contract dispute was resolved. (Id. ¶ 33; ECF No. 42-1 at 53-54). The Beijing panel gave the parties three months to settle the dispute with respect to the 2009 contract. (ECF No. 42-1 at 51.) The parties did not resolve the dispute with respect to the 2009 contract within three months of the March 29, 2011 hearing before the Beijing panel. (Id.)

### 4. Calbex's Unilateral Submission of the Shanghai Award to the Beijing panel

In June 2011, ACC submitted the dispute with respect to the 2009 contract for resolution by arbitration, pursuant to the arbitration clause. (ECF No. 42 ¶ 38.) ACC either submitted the dispute with respect to the 2009 contract directly to the Shanghai sub-commission or CIETAC referred the dispute with respect to the 2009 contract to the Shanghai sub-commission. (ECF No. 37-1 ¶ 15; ECF No. 42-1 at 51.) On June 30, 2011, ACC sent a letter to the "arbitration commission" indicating that the 2009 contract dispute was submitted to the Shanghai sub-commission. (ECF No. 42-1 at 51; ECF No. 37-1 ¶ 16.) On or about October 25, 2012, the Shanghai sub-commission panel issued its decision with respect to the 2009 contract dispute (the "Shanghai award"), which was favorable to Calbex. (ECF No. 42 ¶ 46.) The first page of the Shanghai award was entitled: "SHANGAI BRANCH OF CHINA INTERNTAITONAL ECNOMIC AND TRADE ARBITRATION COMMISSION Arbitral Award." (ECF No. 42-1 at 78.) The Shanghai award provided that "[t]he Arbitration Rules of China International Economic and Trade Arbitration Commission which came into force as of May 1, 2005 (hereinafter referred to as "the Arbitration Rules") are applicable to the arbitration procedures for this case." (ECF No. 42-1 at 79.)

On October 24 or 25, 2012, Calbex contacted the Beijing CIETAC office to inquire about the status of the arbitration with respect to the 2010 contract. (ECF No. 37-2.) Calbex was asked about the status of the Shanghai sub-commission arbitration with respect to the 2009 contract.

(Id.) Calbex informed the Beijing panel that the arbitration with respect to the 2009 contract was resolved. (Id.) Calbex was asked to submit to the Beijing panel proof of the resolution of the dispute with respect to the 2009 contract. (Id.) On October 30, 2012, Calbex provided the Beijing panel a copy of the Shanghai award. (ECF No. 42-1 at 51.)

Neither Calbex nor the Beijing panel notified ACC that Calbex had submitted the Shanghai award to the Beijing panel. (ECF No. 42 ¶ 37.) ACC learned for the first time that Calbex advised the Beijing panel that the 2009 contract dispute had been resolved during discovery in this enforcement action. (Id.) ACC did not have an opportunity to present argument to the Beijing panel with respect to whether the 2009 contract dispute was resolved. (Id.)

### 5. The Beijing Award

On November 19, 2012, the Beijing panel issued its award with respect to the 2010 contract dispute (the "Beijing award"). (ECF No. 42-1 at 48-70.) In the Beijing award the relief requested from Calbex was described as follows:

1. [ACC] pays the purchase price US$359,100.00 to [Calbex];
2. [ACC] pays RMB 120,000.00 yuan or the equivalent to US Dollars to compensate the clamant attorney's fee;
3. [ACC] bears the arbitration fee.

(ECF No. 42-1 at 56.) The defenses asserted by ACC were described in the Beijing award as follows:

1. The payment terms of 30% of the purchase price (a total of US$359,100.00) under the [2010 contract]…have not been achieved. Currently [ACC] has no obligation to make this payment to [Calbex].

1.1 [Calbex] requested [ACC] to pay US$359,100.00. The money is 30% balance under the contract in this case between the claimant and [ACC], and shall be paid in accordance with the contract in this case.

1.2 The original agreed payment method in the contract in this case is D/P at sight. During the performance of the contract, due to the quality problem of the goods which [Calbex] delivered to [ACC] under the other contract, [ACC] has filed the

claim against the claimant. After further communication and negotiation, on June 1 2010 [ACC] sent the email to [Calbex] and proposed to change the payment method of the contract in this case: "WE AGRRE TO PAY 70% 0F THE INVOICE VALUE BY T/T AGAIN DOCUMENTS FOR BFA LOADED ON FALCON ARROW UNDER B/L FAA044TXGO2B(2,100MT), SINCE THERE ARE TWO PENDING CLAIMS RELATED WITH BFASUPPLIED BY CALBEX VIA MV SKSKIN ARROW; WE WILL PAY CALBEXTHE 30% BALANCE AS SOON AS THE TWO CLAIMS FROM M/V SISKIN ARROW ARE SETTLED BETWEEN CALBEX, ACCR AND THE CUSTOMERS AFTER CALBEX'S VISIT TO BRAZIL AND FURTHER DISCUSSIONS BETWEEN RELATED PARTIES" . Immediately [Calbex] replied and agreed. As a result, [Calbex] and [ACC] have reached a new agreement on the payment method of the contract in this case, i.e. [ACC] would pay 70% of the purchase price under the contract in this case by T/T and would pay 30% balance after [Calbex], [ACC] and the customers settle the quality dispute on the contract No, 2009ZC1216. Whereas, the final settlement of the quality dispute on the contract No, 2009ZC1216 constitutes one of the prerequisites for [ACC] to pay 30% balance. Not only did [ACC] provide the corresponding evidence to support the foregoing facts, but [Calbex] also confirmed them in his application for arbitration. Obviously it is not true that [Calbex] alleged that he was forced or in desperation to accept the proposal of [ACC] to change the payment terms.

1.3. Subsequently, in accordance with the above agreement [Calbex] provided goods documents to the respondent and promptly received 70% of the purchase price. This also indicated that [Calbex] was actually performing the contract in this case in accordance with the new payment method both parties agreed on.

1.4. However, so far, even if [ACC] has taken various active actions, [Calbex] and [ACC] failed to settle the quality dispute on the contract No, 2009ZC1216. As a result, the payment terms of 30% balance under the contract No. 2010ZC0211 have not been achieved and currently [Calbex] has no right to request this payment from [ACC].

2. Since it is [Calbex's] fault that the quality dispute on the contract No, 2009ZC1216 has not been settled, the claims and views of [Calbex] to request [ACC] to immediately pay the balance under the contract No. 2010ZC0211 are untenable.

2.1. On the dispute on the contract No. 2009ZC1216, [ACC] always took a positive attitude to resolve the problem, specifically in the following: After [ACC] filed the claim for the goods quality against [Calbex], according to the quality objections and requirements to preserve the goods for the third party to do sampling analysis which was put forward by [Calbex], [ACC] provided active cooperation. In accordance with the contract [ACC] entrusted the third party – an inspection agency (SGS) of the destination port to conduct sampling inspection on the goods and submitted the inspection report to [Calbex]. According to the

inspection report the quality of the goods delivered by the claimant is indeed inconsistent with the contract. Upon the request [ACC] sent an invitation to [Calbex] and invited them to visit Brazil and settle the quality dispute through negotiation. [ACC] was actively looking for new buyers to mitigate further losses due to the quality problems, and solicited [Calbex's] opinions on resale of the goods. [ACC] timely informed [Calbex] of the initial loss (including the amount of the claim). Upon the request of [Calbex] [ACC] properly preserved the goods (right now the goods are still stored in the warehouse of the destination port). [ACC] is always willing to settle the quality dispute through friendly negotiation with [Calbex], and etc.

2.2. However, [Calbex] not only failed to send people to Brazil and settle the quality dispute on the contract No, 2009ZC1216 through negotiation in accordance with the agreement between both parties, but also refused to recognize the inspection report on the goods quality issued by the third party – the inspection agency SGS.

2.3. This shows that it is [Calbex's] fault that the quality dispute on the contract No, 2009ZC1216 has not been settled and [Calbex] shall bear the consequences.

(ECF No. 42-1 at 57-61.) The Beijing panel concluded the following with respect to the 2010

contract dispute:

> The parties in the contract No. 2009ZC1216 are the same as those in the contract in this case. However, in respect of the law the contract No. 2009ZC1216 has nothing to do with this case and is another contract which the claimant and the respondent entered into. The dispute on the contract No. 2009ZC1216 is not included in the scope of the hearing and the arbitration tribunal has no comment on it. The arbitration tribunal only identified the statement of the respondent that 30% balance under the contract in this case shall be paid after the settlement of the dispute on the contract No. 2009ZC1216.

> After investigation, the dispute on the contract No. 2009ZC1216 has been settled. Therefore, in accordance with Article 45 of the Contract Law of the People's Republic of China, the payment terms of 30% balance under the contract in this case have been achieved. From the date of the issuance of the above award, the respondent shall pay 30% balance to the claimant and bear the corresponding costs incurred.

(ECF No. 42-1 at 67.) The Beijing award required ACC to pay Calbex the remaining 30% of the

2010 contract purchase price ($359,100), attorneys' fees in the amount of, or the equivalent of,

120,000 Yuan, and 100% of the arbitration fees ($12,263). (ECF No. 42 ¶ 23.)

## III.   **Standard of Review**

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. Liberty Lobby, 477 U.S. at 248. Even then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. Id. at 248–49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255; Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Doe v. Cnty. of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such

that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing decisions); Liberty Lobby, 477 U.S. at 248–49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. Celotex, 477 U.S. at 323; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (citing Celotex, 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322–23. Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. FED. R. CIV. P. 56(e); see Liberty Lobby, 477 U.S. at 247–48; Celotex, 477 U.S. at 323–25. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen

opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.' " Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

## IV.    Discussion

### A.  Arguments Presented

Calbex contends that it is entitled to summary judgment because there is no dispute that it was granted a foreign arbitral award against ACC, i.e., the Beijing award. (ECF No. 31 at 1.) Calbex contends that pursuant to the Beijing award, it is entitled to the remaining 30% of the unpaid 2010 contract purchase price in addition to specified arbitration and attorneys' fees. (ECF No. 32 at 2.) Calbex argues that the pro-enforcement aims of the New York Convention require the court to enforce the award because ACC cannot assert a defense capable of precluding enforcement. (Id.)

ACC argues that Calbex's motion for summary judgment should be denied because: (1) the conclusion reached by the Beijing panel regarding the Shanghai award was beyond the scope of the submission sent to the Beijing panel for arbitration; (2) ACC did not have the opportunity to argue to the Beijing panel that the Shanghai award was not valid; and (3) the arbitration award issued by the Beijing panel was not in accordance with the parties' contract because it relied on the Shanghai award, which was not issued by a member of CIETAC, to show that the 2009 contract dispute had been resolved. (ECF No. 35 at 7.)

Each of the parties' arguments and the applicable legal standards will be addressed below.

### B.  The Recognition and Enforcement of International Arbitral Awards

"Actions under the New York Convention are deemed to arise under the laws and treaties of the United States" and the Federal Arbitration Act "empowers district courts to compel arbitration in accordance with agreements and to enforce awards falling within the New York Convention." Invista S.A.R.L. v. Rhodia, S.A., 625 F.3d 75, 84 (3d Cir. 2010); see BG Grp., PLC v. Republic of Argentina, 134 S. Ct. 1198, 1205 (2014). "Under the Convention, a district court's role is limited-it must confirm the award unless one of the grounds for refusal specified in the Convention applies to the underlying award." Admart AG v. Stephen & Mary Birch Found., Inc., 457 F.3d 302, 307-11 (3d Cir. 2006); see 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."). Confirmation of an arbitration award under the New York Convention is a "summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm." Zeiler v. Deitsch, 500 F.3d 157, 169 (2d Cir. 2007). The New York Convention created a "'strong public policy in favor of international arbitration' [and] the party seeking to avoid summary confirmance of an arbitral award has the heavy burden of proving that one of the seven defenses [of the New York Convention] applies." VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P., 717 F.3d 322, 325 (2d Cir. 2013) (quoting Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 90 (2d Cir. 2005)); see Invista S.A.R.L., 625 F.3d at 84.

Article V of the New York Convention provides that:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country."

New York Convention, Art. V. "To carry out the policy favoring enforcement of foreign arbitral awards, courts have strictly applied the Article V defenses and generally view them narrowly." Adam AG, 457 F.3d at 308; see China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 283 (3d Cir. 2003).[3]

---

[3]    Publicis Commc'n v. True N. Commc'ns, Inc., 206 F.3d 725, 728 (7th Cir. 2000) ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of

The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies. Art. V(1); Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 313 (2d Cir.1998). The burden is a heavy one, as "the showing required to avoid summary confirmance is high." Yusuf Ahmed Alghanim, 126 F.3d at 23 (quoting Ottley v. Schwartzberg, 819 F.2d 373, 376 (2d Cir.1987)). Given the strong public policy in favor of international arbitration, see Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation, 361 F.3d 676, 683 (2d Cir.2004), review of arbitral awards under the New York Convention is "very limited ... in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." Yusuf Ahmed Alghanim, 126 F.3d at 23 (quoting Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir.1993)).

Encyclopaedia Universalis, 403 F.3d at 90. Each of the Article V defenses—Article V(1)(b), (c), and (d)—raised by ACC will be addressed below.

### C. ACC's Article V(1)(b) Defense

Article V(1)(b) of the New York Convention provides that enforcement of an award may be refused when "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case." New York Convention, Art. V(1)(b). An Article V(1)(b) "defense basically corresponds to the due process defense that a party was not given 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" Generica Ltd. v. Pharm. Basics, Inc., 125 F.3d 1123, 1129 (7th Cir. 1997) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)). In other words, "Article V.1(b) 'essentially sanctions the application of the forum state's standards of due

---

recognition or enforcement of the award specified in the said Convention."); Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 20 (2d Cir. 1997) ("There is now considerable caselaw holding that, in an action to confirm an award rendered in, or under the law of, a foreign jurisdiction, the grounds for relief enumerated in Article V of the Convention are the only grounds available for setting aside an arbitral award."); M & C Corp. v. Erwin Behr GmbH & Co., KG, 87 F.3d 844, 851 (6th Cir. 1996) (concluding that the New York Convention's exclusive grounds for relief "do not include miscalculations of fact or manifest disregard of the law").

process.'" <u>Anhui Provincial Import and Export Corp. v. Hart Enter. Int'l, Inc.</u>, Civ. Action No. 96-128, 1996 WL 229872, at *3 (S.D.N.Y. May 7, 1996) (quoting <u>Parsons</u>, 508 F.2d at 875).

"To comport with due process parties to an arbitration must be given 'notice reasonably calculated' to inform them of the proceedings and 'an opportunity to be heard.'" <u>Jiangsu Changlong Chemicals, Co. v. Burlington Bio-Med. & Scientific Corp.</u>, 399 F. Supp. 2d 165, 168 (E.D.N.Y. 2005) (quoting <u>Anhui, Inc.</u>, 1996 WL 229872, at *3). "Arbitrator[s] are not constrained by formal rules of procedure or evidence; the arbitrator's role is to resolve disputes, based on his consideration of all relevant evidence, once the parties to the dispute have had a full opportunity to present their cases." <u>Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901</u>, 763 F.2d 34, 38 (1st Cir. 1985); <u>Bernhardt v. Polygraphic Co.</u>, 350 U.S. 198, 203-04 n.4 (1956) ( "[a]rbitrators are not bound by the rules of evidence"). Vacating an award is only proper when the exclusion of relevant evidence "actually deprived a party of a fair hearing." <u>Slaney v. Int'l. Amateur Athletic Fed'n</u>, 244 F.3d 580, 592 (7th Cir. 2001).

ACC argues that Calbex is not entitled to summary judgment because Calbex unilaterally and without notice to ACC provided the Shanghai award to the Beijing panel, and the Beijing panel without notice to ACC, considered the Shanghai award as evidence that the 2009 contract dispute was resolved. Under those circumstances, ACC asserts it was not afforded the opportunity to present evidence or argument to the Beijing panel regarding the Shanghai award being null and void, and there are material disputes of fact with respect to whether the Beijing award is enforceable. (ECF No. 35 at 11-12.) Specifically, ACC contends that it was precluded by the conduct of Calbex and the Beijing panel from presenting evidence to the Beijing panel

with respect to the Shanghai sub-commission, its lack of authority to render the Shanghai award, and whether the parties resolved the 2009 contract dispute. (<u>Id.</u> at 11.)

Calbex contends that ACC received a full opportunity to argue its case regarding the 2009 contract to the Beijing panel and that the panel rejected ACC's argument on the merits. (ECF No. 32 at 13-14.) Calbex argues that the court's review "'is limited to determining whether the procedure used was fundamentally unfair'" and that the procedures used by the Beijing panel were fair because ACC was afforded the opportunity to present its case. (<u>Id.</u> (quoting <u>Abu Dhabi Inv. Authority v. Citigroup, Inc.</u>, Civ. Action No. 12-283, 2013 WL 789642, at *7 (S.D.N.Y. Mar. 4, 2013).)

A factual dispute in need of resolution is necessary to establish a violation of due process. Ronald Rotunda & John Nowak, 3 Treatise on Constitutional Law: Substance and Procedure § 17.8(b), at 129 (5th ed. 2012) (citing <u>Pearson v. Dodd</u>, 429 U.S. 396 (1977)). In order to overcome the strong presumption in favor of enforceability under the New York Convention ACC must show there is evidence of record that ACC was *prejudiced* by the Beijing panel's procedure. <u>Karaha Bodas Co., L.L.C., v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara</u>, 364 F.3d 274, 300-04 (5th Cir. 2004) ("'A federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings.'") (quoting <u>Hotel Condado Beach, La Concha and Convention Ctr., v. Union De Tronquistas Local 901</u>, 763 F.2d 34, 40 (1st Cir. 1985)).

ACC contends that it was precluded from presenting evidence to the Beijing panel with respect to whether the Shanghai award resolved the parties' dispute with respect to the 2009 contract. (<u>Id.</u> at 11.) ACC argues that if it had "been granted the opportunity to provide comment, [it] would have advised the Beijing Panel that the 2009 Contract was not in fact resolved, and

that the former Shanghai Sub-commission was without authority to render a decision on that dispute." (ECF No. 38 at 5.) Based upon the undisputed evidence of record, however,—even if the Beijing panel gave ACC notice and a full and fair opportunity to be heard—there is no indication that ACC knew about the Shanghai sub-commission declaring its independence from CIETAC and the ramifications of that action at any time during which it could have objected to the Beijing panel relying on the Shanghai award as evidence. If ACC did not know the basis on which it would challenge the Shanghai award during the relevant time frame, ACC could not argue against the enforceability of the Shanghai award. The only evidence of record with respect to what ACC knew prior to the issuance of the Beijing award is in paragraph 17 of the declaration of Martin Ware ("Ware"), the chief executive officer of ACC's successor, MFC Resources, Inc.[4] (ECF No. 37-1 ¶ 17.) In paragraph 17 of Ware declares:

> Unbeknownst to ACC at the time, in early 2012, the Shanghai Subcommission declared its independence from CIETAC. CIETAC then suspended (and ultimately terminated) the Shanghai Subcommission's authority to administer arbitration cases.

(Id.) This evidence shows that at least in "early 2012" ACC was unaware of the events surrounding the Shanghai sub-commission's independence, and there is no evidence to suggest **when** ACC found out about the Shanghai sub-commission declaring its independence from CIETAC and the possible ramifications of that action.

---

[4] In ACC's sur-reply brief, it writes:

> Calbex also implies that ACC knew [all] along that Shanghai Panel was without authority but sat idly by while the Beijing Panel rendered its decision and while Calbex filed the instant action to enforce that Award. However, ACC did not know at the time of the dispute between CIETAC and its rogue sub-commissions (Exhibit A ¶ 17).

(ECF No. 44 at 2 n.1.) The foregoing passage is argument by ACC and not considered evidence for the purpose of resolving Calbex's motion for summary judgment. Nonetheless, the passage implies that ACC did not know about the Shanghai sub-commission's declaration of independence from CIETAC and the ramifications of that action at a time during which it could have argued the Beijing panel's reliance on the Shanghai award was improper.

ACC submitted three statements from CIETAC about the Shanghai sub-commission declaring its independence from CIETAC and the ramifications of that action, but there is no evidence of record that ACC knew about the statements or their contents at a time during which ACC could have objected to the Beijing panel's reliance upon the Shanghai award. Without that kind of evidence, ACC cannot show it was prejudiced by not receiving notice that the Beijing panel was considering the Shanghai award as evidence. Under those circumstances, there could not have been a factual dispute in need of resolution by the Beijing panel and ACC could not be prejudiced by the Beijing panel failing to provide ACC notice and a full and fair opportunity to be heard. ACC's reliance on the Article V(1)(b) defense will not, therefore, preclude the entry of summary judgment in favor of Calbex. Even when viewing the evidence in the light most favorable to ACC, it failed to meets it burden to "set forth specific facts showing that there is a genuine issue for trial" with respect to this defense. FED. R. CIV. P. 56.

**D. ACC's Article V(1)(c) Defense**

Article V(1)(c) of the New York Convention provides that an arbitration award may be disregarded if the "award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration… ." New York Convention, Art. V(1)(c). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960); BG Grp., PLC, 134 S. Ct. at 1206. "In other words, if the parties did not agree in the contracts to submit certain disputes to arbitration, then arbitral awards purporting to resolve those disputes should not be confirmed." Four Seasons Hotels and Resorts, B.V. v. ConSorcio Barr S.A., 377 F.3d 1164, 1168 (11th Cir. 2004).

Article V(1)(c) is to be "construed narrowly to advance the 'enforcement-facilitating thrust of the Convention.'" Am. Const. Mach. & Equip. Corp. v. Mechanised Const. of Pakistan Ltd., 659 F. Supp. 426, 429 (S.D.N.Y. 1987) (quoting Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA), 508 F.2d 969, 976 (2d Cir. 1974). A party challenging the enforcement of an arbitral award based upon the "beyond the scope" defense "'must ... overcome a powerful presumption that the arbitral body acted within its powers.'" Chevron Corp. v. Republic of Ecuador, 949 F.Supp.2d 57, 67 (D.D.C. 2013) (quoting Parsons, 508 F.2d at 976). "[S]uch limited review is consistent with 'the basic purposes of arbitration: to resolve disputes speedily and to avoid the expense and delay of extended court proceedings.'" Chevron Corp., 949 F.Supp.2d at 67 (quoting Fed. Commerce & Navigation Co. v. Kanematsu-Gosho, Ltd., 457 F.2d 387, 389 (2d Cir. 1972)).

Here, the undisputed evidence of record shows the matters arbitrated by the Beijing panel were not "beyond the scope" of the 2010 contract or Calbex's request for relief to CIETAC. As the Court of Appeals for the Eleventh Circuit acknowledged in Four Seasons, the "beyond the scope" defense concerns whether the parties' contract contemplated the submission of a particular dispute to CIETAC. Four Seasons, 377 F.3d at 1168 ("[I]f the parties did not agree in the contracts to submit certain disputes to arbitration, then arbitral awards purporting to resolve those disputes should not be confirmed."). The 2010 contract contained the following arbitration clause:

> **Arbitration**. All disputes arising between the parties in connection with Contract shall be submitted to China International Economic & Trade Arbitration Commission ("CIETAC") for settlement by Arbitration in accordance with the CIETAC's provisional rules of procedure. The award rendered by CIETAC shall be final and binding on both parties.

(ECF No. 42 ¶ 29.) Pursuant to this provision, all disputes arising between the parties with respect to the 2010 contract were required to be submitted to CIETAC for arbitration. Accordingly, to the extent the Beijing panel made a determination with respect to the 2010 contract, that matter is subject to arbitration under the 2010 contract.

The undisputed evidence of record shows:

- Calbex submitted its arbitration request to CIETAC to obtain full payment from ACC under the 2010 contract;

- ACC argued to the Beijing panel that it did not owe Calbex full payment under the 2010 contract because the parties agreed ACC was not required to pay the remaining 30% of the purchase price until the parties resolved the 2009 contract dispute, and Calbex refused to resolve the 2009 contract dispute; and

- the Beijing panel agreed with ACC that the resolution of the 2009 contract was a condition precedent to ACC's payment obligations to Calbex under the 2010 contract.

Based upon those facts, whether Calbex was entitled to the relief it sought from the Beijing panel, i.e., full payment from ACC under the 2010 contract, depended upon whether the parties resolved the dispute with respect to the 2009 contract. The Beijing panel never determined or purported to determine how the 2009 contract dispute *should be* resolved; rather, the Beijing panel based upon the Shanghai award determined the dispute with respect to the 2009 contract *was* resolved. The Beijing panel did not, therefore, act beyond the scope of the submission of arbitration when it determined that ACC was required to pay Calbex the remaining 30% of the purchase price of the 2010 contract. ACC's reliance on the Article V(1)(c) defense will not preclude the entry of summary judgment in favor of Calbex because even when viewing the evidence in the light most favorable to ACC, it failed to meets it burden to "set forth specific facts showing that there is a genuine issue for trial" with respect to this defense. FED. R. CIV. P. 56.

**E.  ACC's Article V(1)(d) Defense**

Under Article V(1)(d) of the New York Convention, a party may avoid the enforcement of an arbitration award when "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place." New York Convention, Art. V(1)(d). Courts recognize that arbitration agreements are a matter of contract and parties cannot be forced to exceed the limits of those agreements. China Minmetals Materials Imp, 334 F.3d at 283-84. Most arbitration awards are to be enforced, but the finality of arbitration awards do not prohibit judicial review to "ensure that necessary safeguards are not foreclosed." M & C Corp., 87 F.3d at 847. This protection ensures that the defenses described in the New York Convention will "remain available to parties who are unsuccessful in arbitration proceedings." Id.

In order to overcome the strong presumption in favor of enforceability under the New York Convention, however, a party asserting an Article V(1)(d) defense must show there is evidence of record that it was *prejudiced* by the procedure used. Karaha Bodas Co., 364 F.3d at 300-04; Compagnie des Bauxites de Guinee v. Hammermills, Inc., Civ. Action No. 90-0169, 1992 WL 122712, at *5 (D.D.C. May 29, 1992). The court in Hammermills explained the rationale behind the prejudice requirement as follows:

> The Court does not believe that section 1(d) of Article V was intended, as CBG argues, to permit reviewing courts to police every procedural ruling made by the Arbitrator and to set aside the award if any violation of ICC procedures is found. Such an interpretation would directly conflict with the "pro-enforcement" bias of the Convention and its intention to remove obstacles to confirmation of arbitral awards. *See* Carte Blanche (Signapore) [sic] Pte., Ltd. v. Carte Blanche Int'l, Ltd., 683 F.Supp. 945, 956 (S.D.N.Y.1988) ("A major purpose of the Federal Arbitration Act is to avoid delay and unnecessary expense to the parties ..., and the delay that would result from reviewing procedural rulings of the arbitrators would be substantial."); *cf.* Parsons & Whittemore Overseas Co., 508 F.2d at 973

("An expansive construction of this defense [section 2(b) of Article V] would vitiate the Convention's basic effort to remove pre-existing obstacles to enforcement."). Rather, the Court believes that a more appropriate standard of review would be to set aside an award based on a procedural violation only if such violation worked substantial prejudice to the complaining party.

Id.

"To determine whether the procedure used was contrary to the parties' agreed arbitral procedures, [the court] must begin with the language of the parties' arbitration agreement." Polimaster Ltd. v. RAE Sys., Inc., 623 F.3d 832, 836-37 (9th Cir. 2010). The relevant agreement with respect to this enforcement action is the 2010 contract because that is the contract that was submitted to arbitration before the Beijing panel. The arbitration provision in the 2010 contract provided:

> **Arbitration.** All disputes arising between the parties in connection with Contract shall be submitted to China International Economic & Trade Arbitration Commission ("CIETAC") for settlement by Arbitration in accordance with the CIETAC's provisional rules of procedure. The award rendered by CIETAC shall be final and binding on both parties.

(ECF No. 42 ¶ 29; ECF No. 42-1 at 24). There is no dispute in this case that the parties agreed to arbitrate all disputes arising from the 2010 contract according to the CIETAC rules of procedure. In other words, to the extent the Beijing panel violated CIETAC rules of procedure, it violated the arbitration provision of the 2010 contract.

ACC argues the Beijing panel violated the parties' agreement by: (1) relying upon the Shanghai award; and (2) communicating ex parte with Calbex with respect to the Shanghai award, and, thus, violating CIETAC Articles 40(1), 40(2), and 41(3).

With respect to the first argument—reliance on the Shanghai award—there is nothing in the 2010 contract or the CIETAC rules of procedure that prohibited the Beijing panel from relying upon the Shanghai award to determine the condition precedent to ACC's obligation to

pay Calbex was satisfied. In other words, there was no CIETAC rule of procedure which precluded the Beijing panel from considering the Shanghai award as evidence. Whether the Shanghai award violated the parties' 2009 contract or CIETAC rules of procedure is a different issue,[5] and not relevant to whether the Article V(d)(1) defense is applicable in this case with respect to the 2010 contract. At best, this argument is a repeat of the due process arguments addressed above in the discussion of ACC's alleged Article V(1)(b) defense. ACC did not adduce evidence sufficient to create a genuine dispute of material fact with respect to whether the Beijing panel's consideration of the Shanghai award violated the 2010 contract.

ACC's second argument in support of its Article V(1)(d) defense is that the Beijing panel violated the 2010 contract and CIETAC Articles 40(1), 40(2), and 41(3) when it communicated with Calbex about the Shanghai award and relied upon the Shanghai award without providing ACC notice and an opportunity to examine the evidence and be heard. Article 40(1) provides:

> Where a case is examined by way of an oral hearing, the evidence shall be produced at the hearing and may be examined by the parties.

(ECF No. 42-1 at 150.) ACC argues the Beijing panel violated this rule of procedure because Calbex submitted documentary evidence to the Beijing panel in support of Calbex's contention that the dispute with respect to the 2009 contract was resolved, and ACC did not have the opportunity to examine the documentary evidence. ACC argues "[t]he CIETAC Arbitration Rules require that all parties be allowed to examine any evidence submitted." (ECF No. 38 at 10.) To the extent the Beijing panel "examined" the dispute with respect to the 2010 contract "by way of an oral hearing" on March 29, 2011, the documentary evidence presented by Calbex to

---

[5] This argument may also be invalid. The Shanghai award provides that the CIETAC procedures were followed, and CIETAC in December 2012 stated that cases being administered before August 1, 2012—like the 2009 contract dispute, which was submitted in June 2011—"may be concluded in accordance with the CIETAC Arbitration Rules and under the uniform leadership of CIETAC in respect of case administration as provided in the Rules." (ECF no. 42-1 at 138.)

the Beijing panel with respect to the Shanghai award did not exist at the time of the hearing. The Beijing panel did not, therefore, violate Article 40(1) in this case.

Article 40(2) provides:

> Where a case is to be decided on the basis of documents only, or where the evidence is submitted after the hearing and both parties have agreed to examine the evidence by means of writing, the parties may examine the evidence without an oral hearing. In such circumstances, the parties shall submit their written opinions on the evidence within the time period specific by the arbitral tribunal.

(ECF No. 42-1 at 150.) ACC argues the Beijing panel violated Article 40(2) because parties have a "right to present 'their written opinions on the evidence.'" (ECF No. 38 at 10 (quoting (ECF No. 42-1 at 150).) Here, Calbex submitted evidence—the Shanghai award—after the March 29, 2011, hearing, but there is no evidence that the parties "agreed to examine the evidence by means of writing." (ECF No. 42-1 at 150.) Article 40(2) is permissive in nature and provides that "the parties *may* examine the evidence without an oral hearing." (ECF No. 42-1 at 140 (emphasis added).) It does not provide—as ACC suggests—an absolute right to submit a written opinion on the evidence; rather, the article provides that a panel *may* conduct in arbitration as prescribed in the Article. Article 40(2) does not, therefore, provide a basis for ACC to assert an Article V(1)(d) defense and preclude the entry of summary judgment in favor of Calbex in this case.

Article 41(3) provides:

> Evidence collected by the arbitral tribunal though its own investigation shall be forwarded to the parties for their comments.

(ECF No. 42-1 at 150.) The Beijing panel in the Beijing award wrote:

> *After investigation*, the dispute on the contract No. 2009ZC1216 has been settled. Therefore, in accordance with Article 45 of the Contract Law of the People's Republic of China, the payment terms of 30% balance under the contract in this case have been achieved. From the date of the issuance of the above award, the respondent shall pay 30% balance to the claimant and bear the corresponding costs incurred.

(ECF No. 42-1 at 67 (emphasis added).) The undisputed evidence of record shows the Beijing panel through its investigation, i.e., its communications with Calbex following the March 29, 2011, hearing, obtained the Shanghai award as evidence that the dispute with respect to the 2009 contract was resolved. According to Article 41(3), the Beijing panel was required to forward any evidence received in the course of its investigation to ACC. The undisputed evidence of record shows the Beijing panel did not forward the documents it obtained from Calbex to ACC. Under those circumstances, the Beijing panel did not follow the CIETAC Arbitration Rules, and, therefore, its procedure violated the agreement of the parties, i.e., the 2010 contract.

As discussed above, however, in order to overcome the strong presumption in favor of enforceability under the New York Convention, ACC must show there is evidence of record that ACC was *prejudiced* by the Beijing panel's procedure not being in accordance with the 2010 contract. Karaha Bodas Co., 364 F.3d at 300-04; Hammermills, 1992 WL 122712, at *5; The undisputed evidence of record shows:

- the Beijing panel knew from ACC that ACC submitted the dispute with respect to the 2009 contract to CIETAC and the matter was before the Shanghai sub-commission;

- Calbex unilaterally informed the Beijing panel that the dispute with respect to the 2009 contract was resolved;

- Calbex unilaterally submitted the Shanghai award to the Beijing panel to prove the dispute with respect to the 2009 contract dispute was resolved; and

- the Shanghai award is entitled "SHANGHAI BRANCH OF CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION Arbitral Award" and provides that the CIETAC Arbitration Rules were applied to the dispute. (ECF No. 42-1 at 78-79.)

At the time the Beijing award was issued on November 19, 2012 CIETAC was aware that the Shanghai sub-commission declared its independence from CIETAC, and CIETAC suspended the Shanghai sub-commission as of August 1, 2012, but as of December 31, 2012, permitted cases

submitted to the Shanghai sub-commission prior to August 1, 2012, (like the 2009 contract dispute) to be concluded under CIETAC leadership and the CIETAC arbitration rules. That evidence, however, is not sufficient to create a genuine dispute of material fact with respect to whether the Beijing panel knew about the Shanghai sub-commission's suspension or ACC knew about the Shanghai sub-commission's suspension during a time when, if it had notice, it could have challenged the Shanghai award. In other words, there is no evidence that ACC was prejudiced by the Beijing panel's consideration of the Shanghai award as evidence.

Because there is no evidence of record that—even if the Beijing panel provided ACC notice and a full and fair opportunity to be heard—ACC knew about Shanghai declaring its independence from CIETAC and the ramifications of that action within a time it could have challenged the Shanghai award, ACC failed to adduce evidence sufficient to show it was prejudiced by the Beijing panel's failure to abide by Article 41(3). Based upon the foregoing, ACC's reliance on the Article V(1)(d) defense will not preclude the entry of summary judgment in favor of Calbex. Even when viewing the evidence in the light most favorable to ACC, it failed to meets it burden to "set forth specific facts showing that there is a genuine issue for trial" with respect to this defense. FED. R. CIV. P. 56.

Having determined ACC failed to satisfy its burden to adduce evidence sufficient to raise a genuine dispute about a material fact with respect to an Article V defense, the Beijing award will be enforced. The remaining issues to be decided are whether Calbex is entitled to post-award, prejudgment interest and attorneys' fees. Those issues will be addressed in turn.

## F. Calbex's Entitlement to Post-Award, Prejudgment Interest and Attorney's Fees

### 1. Post-Award, Prejudgment Interest

In this case, Calbex requests post-award prejudgment interest from the date of the Beijing award, November 19, 2012, to the issuance of the instant opinion and accompanying order. (ECF No. 32 at 6-9.) ACC argues Calbex is not entitled to post-award, prejudgment interest because "Calbex has failed to act diligently and in good faith to bring this matter to a swift resolution." (ECF No. 38 at 14.)

"'[T]he awarding of prejudgment interest under federal law is committed to the trial court's broad discretion.'" Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 208 (3d Cir. 2004) (quoting Ambromovage v. United Mine Workers of Am., 726 F.2d 972, 981-82 (3d Cir. 1984)). At least three courts of appeals have held that "post-award, prejudgment interest is available in an action to confirm an arbitration award under the New York Convention." Ministry of Def. and Support for the Armed Forces of the Islamic Republic v. Cubic Def. Sys., Inc., 665 F.3d 1091, 1102 (9th Cir. 2011) (citing Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1446-47 (11th Cir. 1998); Waterside Ocean Navigation Co. v. Int'l Ltd., 737 F.2d 150, 153-54 (2d Cir. 1984)); see also Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria, --- F'App'x ----, 2015 233385, at *3 (D.C. Cir. Jan. 16, 2015) (affirming the district court's issuance of prejudgment interest at the prime rate in a case arising under the New York Convention). In Industrial Risk Insurers, the Court of Appeals for the Eleventh Circuit explained:

> Unlike most other countries, the United States has no federal statute governing awards of prejudgment interest on international arbitral awards. *See* John Y. Gotanda, "Awarding Interest in International Arbitration," 90 Am. J. Int'l L. 40, 45 (1996). Instead, awards of prejudgment interest are equitable remedies, to be awarded or not awarded in the district court's sound discretion. *See* Osterneck v. E.T. Barwick Ind., Inc., 825 F.2d 1521, 1536 (11th Cir.1987); Waterside Ocean Navigation Co. v. International Navigation Ltd., 737 F.2d 150, 153 (2d Cir.1984). Under the law of this circuit, "[p]re-judgment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his," *see* Insurance Co. of N. Am. v. M/V Ocean Lynx, 901 F.2d 934, 942 (11th Cir.1990),

and absent any reason to the contrary, it should normally be awarded when damages have been liquidated by an international arbitral award. *See* Waterside Ocean Navigation, 737 F.2d at 153–54 ("Absent persuasive reasons to the contrary, we do not see why pre-judgment interest should not be available in actions brought under the [New York] Convention."); *see also* Fort Hill Builders, Inc. v. National Grange Mut. Ins. Co., 866 F.2d 11, 14 (1st Cir.1989) (holding that, under either federal or Rhode Island law, post-award, prejudgment interest should be awarded on domestic arbitral award); Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59 (3d Cir.1986) (holding that confirmed domestic arbitral award bears interest from date of award, not from date of judgment confirming award).

Indus. Risk Insurers, 141 F.3d at 1446.

In Feather v. United Mine Workers of America, 711 F.2d 530 (3d Cir. 1983), the Third Circuit Court of Appeals set forth the following four factors the court should consider to determine whether an award of prejudgment interest is appropriate:

> "(1) whether the claimant has been less than diligent in prosecuting the action;
> (2) whether the defendant has been unjustly enriched;
> (3) whether an award would be compensatory; and
> (4) whether countervailing equitable considerations militate against a surcharge."

Feather, 711 F.2d at 540 (quoting Nedd v. United Mine Workers of Am., 488 F.Supp. 1208, 1219-20 (M.D. Pa. 1980)).  The facts of this case and each of the four factors will be addressed below.

>  *a.  Whether the claimant has been less than diligent in prosecuting the action*

Calbex argues it "acted diligently in seeking to enforce the Award" because it filed the instant action four months after obtaining the Beijing award and "attempted to resolve the case at the earliest possible stage by filing for summary judgment prior to the close of fact discovery." (ECF No. 32 at 7-8.) ACC argues Calbex did not prosecute this case in a diligent manner because it "wantonly delayed this case by frustrating [ACC's] attempts at discovery, prematurely filing a frivolous motion for summary judgment, and not engaging in settlement negotiations in

good faith." (ECF No. 38 at 13.) This case is just over two years old. The court set dates for the filing of Calbex's motion for summary judgment about fourteen months after the case was initiated, and the period for fact discovery ended on March 15, 2014. To the extent Calbex filed a "premature" summary judgment motion six days prior to the close of fact discovery and while ACC had outstanding discovery requests, that act in light of the age of this case is not a sufficient basis upon which the court can conclude Calbex has been less than diligent in prosecuting this action. See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., Civ. Action No. 09-290, 2014 WL 1320154, at *6 (W.D. Pa. Mar. 31, 2014) (denying the plaintiff's request for prejudgment interest where the plaintiff "unreasonably and inexcusably delayed filing this litigation for a period of five years and eleven months because it failed to timely conduct a sufficient investigation into infringement allegations brought to its attention by the inventors"). To the extent ACC argues Calbex did not negotiate this case in good faith, the record provided to the court does not support that argument. At best for ACC, this factor is neutral in the court's determination of whether postaward, prejudgment interest is appropriate in this case.

b. *Whether the defendant has been unjustly enriched* and *whether an award would be compensatory*

Calbex argues that with respect to the second and third factors:

> ACC has been unjustly enriched by its nonpayment because it has had the free use of the more than $350,000 that it has owed Calbex since April 16, 2010, in the first place, and since CIETAC arbitration panel issued the Award in favor of Calbex on November 19, 2012. … By the same token—because Calbex would have had the ability to earn interest on the amount owed pursuant to the Award if it had been paid in a timely manner—the award of prejudgment interest would be compensatory in this case.

(ECF No. 32 at 8.) Whether defendant has been unjustly enriched and whether an award would be compensatory "are the two fundamental purposes for awarding prejudgment interest." United States v. Golden Acres, Inc., 702 F.Supp. 1097, 1110 (D. Del. 1988). Here, ACC has withheld

from Calbex the remaining 30% it owed to Calbex pursuant to 2010 contract, i.e., $359,100. That amount became due—at the latest—on the date the Beijing award was issued—November 19, 2012.

With respect to unjust enrichment, the court of appeals in Feather, explained:

> "To the extent defendant has had the free use of the income-producing ability of plaintiff's money without having to pay for it, he has been unjustly enriched. To divest defendant of this unjustified benefit is not to penalize him, for it has been determined by the trial that it was never rightfully his."

Feather, 711 F.2d at 540 (quoting *Recent Developments—Prejudgment Interest as Damages: New Application of an Old Theory*, 15 Stan.L.Rev. 107, 109 (1962) [hereinafter *Recent Developments*]). Because ACC owed Calbex $359,100 under the 2010 contract, and ACC withheld that money from Calbex for more than two years, ACC "has had the free use of the income-producing ability of [Calbex's] money without having to pay for it." Id. ACC was, therefore, unjustly enriched by its refusal to pay Calbex the money it owed under the 2010 contract. This factor, therefore, weighs in favor of the court granting Calbex post-award, prejudgment interest.

With respect to the third factor, i.e., whether an award would be compensatory, the court in Bradford-White v. Ernst & Whinney, Civ. Action No. 83-3371, 1990 WL 48305 (E.D. Pa. Apr. 17, 1990), explained:

> The "compensation" or "loss theory" of prejudgment interest is based on the "assumption that the inherent income-producing ability of money cannot be separated from the money itself; hence denial of interest would be denial of an inexorable economic fact."

Bradford-White, 1990 WL 48305, at *4 (quoting *Recent Developments*, supra). As discussed above, ACC withheld $359,100 that belonged to Calbex. Calbex, therefore, was deprived of the

income-producing value of that money. This factor weighs in favor of granting Calbex post-award, prejudgment interest in this case.

> c.    *Whether countervailing equitable considerations militate against a surcharge*

The court cannot discern any countervailing equitable considerations which militate against the award of prejudgment interest in this case. As the court noted in <u>Bradford-White</u>, "[t]o the contrary, under the circumstances prejudgment interest would be a step toward making the plaintiff whole, which is one of the basic purposes of such a discretionary award." <u>Bradford-White</u>, 1990 WL 48305, at *4 (citing <u>Nedd</u>, 488 F.Supp. at 1220).

Weighing the applicable factors, because ACC was unjustly enriched by withholding the $359,100 that belonged to Calbex pursuant to the 2010 contract, and deprived Calbex of the income-producing value of that money, Calbex is entitled to prejudgment interest in this case beginning on November 19, 2012, through the date of this opinion and accompanying order, at the rate provided for in 28 U.S.C. § 1961(a).[6] <u>Norththrop Corp. v. Triad Int'l Mktg. S.A.</u>, 842 F.2d 1154, 1155 n.2 (9th Cir. 1988) ("Under federal law the rate of both prejudgment and postjudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate.").

## 2. Attorneys' Fees

---

[6]    Title 21, United States Code, Section 1961(a) provides:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [FN1] the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

21 U.S.C. § 1961(a).

"Under the American rule, each party normally must bear the burden of its own legal expenses, including attorneys' fees. One of the narrow exceptions to this rule is a finding that the losing party litigated in bad faith, vexatiously, or for oppressive reasons." Mobil Oil Corp. v. Indep. Oil Workers Union, 679 F.2d 299, 305 (3d Cir. 1982). "In suits to compel one party to submit to arbitration or abide by an award, fees are generally awarded if the defaulting party acted without justification, or if the party resisting arbitration did not have a 'reasonable chance to prevail.' " Wilkes Barre Hosp. Co., LLC v. Wyoming Valley Nurses Ass'n Pasnap, 453 F. A'ppx. 258, 261 (3d Cir. 2011) (quoting Chauffeurs, Teamsters and Helps, Local Union No. 765 v. Stroehmann Bros. Co., 625 F.2d 1092, 1094 (3d Cir. 1980)).

Here, Calbex requests attorneys' fees because ACC "litigated in bad faith, vexatiously, or for oppressive reasons." (Id. at 9.) ACC argues Calbex is not entitled to attorneys' fees because it cannot meet the "very high standard" warranting the application of the exception to the general rule that "each party is to bear its own costs and legal expenses, including attorneys' fees." (ECF No. 38 at 15.) Having reviewed the record and the parties' submissions in this case, the court cannot conclude that ACC was without justification or a reasonable chance to prevail in this case; indeed, Calbex argues that "Chinese cases addressing the enforceability of decisions from the Shanghai Sub-Commission during 2012 and thereafter have been equally inconclusive." (ECF No. 39 at 6.) Under those circumstances, ACC did not act without justification in this case when it withheld the money owed to Calbex under the 2010 contract. Accordingly, Calbex has not met its burden to show it is entitled to attorneys' fees in this case.

## V.    CONCLUSION

Calbex's motion for summary judgment (ECF No. 31) will be granted in part and denied in part. The motion for summary judgment will be denied with respect to Calbex's request for

attorneys' fees. The motion for summary judgment will be granted in all other respects. The Beijing award will be confirmed. ACC shall pay post-award, prejudgment interest to Calbex in accordance with 21 U.S.C. § 1961(a).

An appropriate order will be entered.

BY THE COURT,

Dated:  March 13, 2015                                 /s/ *Joy Flowers Conti*
                                                        Joy Flowers Conti
                                                        Chief United States District Judge